**FONTANA AVIATION, INC.,**
**Plaintiff-Appellant,**

v.

**The CESSNA AIRCRAFT COMPANY**
**and Cessna Finance Corporation,**
**Defendants-Appellees.**

**No. 79–1863.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1979.

Decided March 19, 1980.

Francis J. McConnell, Chicago, Ill., for plaintiff-appellant.

Alan I. Becker, Kirkland & Ellis, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Fontana Aviation, Inc., plaintiff, appeals the granting of the defendants', Cessna Aircraft Company and Cessna Finance Corporation, motion for summary judgment in Fontana's antitrust action alleging violation of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), and seeking treble damages and injunctive relief pursuant to the provisions of the Clayton Act, 15 U.S.C. §§ 15, 26 (1976). Judge Flaum, understanding Fontana's claim to be only for the recovery of damages arising from Cessna's pricing policy, held that damages were not recoverable under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

The parties need to be identified and their relationships considered. Fontana was a Michigan corporation, now no longer in business, which had its principal place of business at a Michigan airport. It was in the business of selling new and used general aviation aircraft, including Cessna aircraft, but more importantly, so far as this case is concerned, was also in the business of selling and performing custom installations of avionics equipment manufactured by other than Cessna Aircraft Company (Cessna).[1] Cessna, a Kansas corporation, with its principal place of business in Wichita, Kansas, is one of the larger domestic manufacturers of general aviation aircraft. Through its Aircraft Radio and Control Division (ARC), Cessna manufactures and sells its own line of avionics. Cessna Finance Corporation (CFC), also located in Wichita, Kansas, a wholly-owned subsidiary of Cessna, is in the business of providing financing for distributors, dealers and purchasers of Cessna products. Except for jet aircraft sold directly to consumers, Cessna's other aircraft and products are sold in the market by independent retail dealers. Although Fontana was a Cessna dealer, it did not purchase directly from Cessna, but from Aviation Activities, Inc., an independent Cessna distributor. Aviation Activities, Inc., however, was alleged to be a co-conspirator although not named as a defendant.

Procedurally, Judge Flaum granted Cessna's and CFC's motion for summary judgment on tie-in claims but denied it on the cognizability of the product market. However, Judge Flaum relying on *Illinois Brick* also granted summary judgment on Fontana's damage claims on the basis that Fontana had purchased its Cessna aircraft not directly from Cessna, but from Aviation Activities, Inc. As that holding left Fontana only its claims for injunctive relief which would afford little practical satisfaction as it had liquidated, Fontana filed an amended complaint omitting requests for injunctive relief so that in the event of a similar ruling

on the damage claim, the ruling would be appealable. Judge Flaum reaffirmed his view on the damage claims and again disposed of the matter by summary judgment under the rationale of *Illinois Brick*.

In its amended complaint, Fontana alleges in Count I that Cessna, CFC and Aviation Activities, Inc. conspired to unreasonably restrain trade in the business of selling and installing non-Cessna avionics equipment in Cessna aircraft in violation of Section 1 of the Sherman Act, and in Count II of unreasonably restraining trade by monopolizing and attempting to monopolize the selling and installation of avionics equipment in Cessna aircraft in violation of Sections 1 and 2 of the Sherman Act. Fontana alleges the purpose and intent of the alleged conspiracy was to put it and similar Cessna dealers out of business so as to enhance Cessna's own avionics business. Fontana alleges that before Cessna changed its policies in the avionics field a substantial percentage of Cessna multi-engine aircraft was sold by Cessna without factory-installed avionics. This permitted the purchaser to freely select his own brand of avionics for custom field installation by those particular Cessna dealers who had that capability. Fontana prospered as a specialist in avionics installation, which distinguished Fontana from many other Cessna dealers who lacked that proficiency. Fontana further alleges that the "multi-faceted conspiracy" contained various elements which we shall examine briefly.

Fontana complains of a change in pricing policy instituted by Cessna in 1974. Cessna at that time began offering certain of its aircraft with factory-installed avionics at a special package price which was less than the price if the aircraft and avionics were separately purchased. In 1975 the list price of unequipped aircraft went up and the price of factory-installed avionics went down, amounting to both overcharges and undercharges according to Fontana. Also in 1975 CFC changed its financing policy

---

1.  General aviation aircraft broadly refers to private aircraft as distinguished from commercial or military aircraft. Avionics equipment refers to communication, navigation and guidance equipment for use in aircraft.

and declined to finance other than Cessna avionics. All other brand avionics, however, after installation would become subject to Cessna's lien on the aircraft. A number of other claimed misdeeds are charged to be a part of the "multi-faceted conspiracy" including a national advertising campaign disparaging the custom installation of non-Cessna avionics; introduction of a dealer rebate program; introduction of a line of Cessna aircraft which could be purchased only with factory-installed Cessna avionics; the pressuring of Cessna dealers not to engage in sales outside their own areas; the informing of Cessna dealers that they could not sell Cessna aircraft and also be in the business of installing non-Cessna avionics; and, the temporary withdrawal of trade-in financing for used aircraft received by Fontana in the course of its business. Those activities are claimed by Fontana to have been conspiratorially calculated to cause it competitive injury.

Cessna and CFC explain that their pricing policy and other changes were only to enhance their own competitive position in the avionics markets. Cessna points as justification for its commercial behavior to Fontana's own allegation that Cessna avionics were inferior and overpriced. It is Cessna's position that in the trial court Fontana focused only on the pricing policy and that the other allegations were either shown to be nonexistent or to be ordinary and lawful pro-competitive business reaction and behavior. Cessna and CFC claim that any damages suffered by Fontana were due only to the loss of Fontana's temporary enjoyment of a substantial competitive advantage over other Cessna dealers on which Fontana had no justification to rely. Cessna explains that there was no tying of the sale of Cessna avionics to the purchase of Cessna aircraft as both continued to be available separately. The purchase of one product was not conditioned on the purchase of the other. The trial judge rejected any tying theory based only on economic incentives. *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1173 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). As to financing, Cessna

and CFC deny any obligation to finance a competitor's avionics, but in any event it is claimed financing was available from others. Cessna and CFC further claim there was no disparaging advertising chargeable to them; that a rebate program also questioned provided only for discounts on financial purchases for prompt payment; and that the line of Cessna aircraft available exclusively with Cessna avionics was not introduced in the market until after Fontana had liquidated. Cessna and CFC dispute any territorial restrictions and the purported withdrawal of financing for used aircraft.

Cessna argues that *Illinois Brick* controls Fontana's case because only the first person upon whom an illegal price has been imposed suffers any legally cognizable antitrust injury. It is urged that *Illinois Brick* applies because in between Cessna and Fontana was Aviation Activities, Inc., a totally independent Cessna dealer with whom Fontana did its Cessna business. *Illinois Brick* prohibits any pass on theory of damages. Fontana, on the other hand, argues that *Illinois Brick* is not applicable because the theory of its case is that as an avionics competitor of Cessna it suffered competitive injury. Fontana does not claim to be a customer complaining about an overcharge. Further, Fontana claims that the trial court considered only one aspect of its conspiracy allegations, the pricing policy, and ignored the other charges, whereas the conspiracy as alleged consisted of a combination of things including not only pricing but other acts as well. Although Judge Flaum did not reach the issue, Cessna and CFC, relying on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), argue that Fontana is seeking damages for injury resulting only from increased, non-predatory competition to which it is not entitled.

*Illinois Brick* must be examined. Ultimate users of concrete blocks, the owners of buildings, brought suit against the manufacturers of the concrete blocks alleging a conspiracy to fix prices in violation of Section 1 of the Sherman Act and seeking

treble damages under Section 4 of the Clayton Act. It was claimed by plaintiffs that the intermediaries in the chain of distribution, masonry contractors and general contractors, had passed on to them the increased fixed prices. The Court held that indirect purchasers, the plaintiff building owners, had no claim for Clayton Act Section 4 treble damages against the manufacturers under an expansion of the rationale of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). *Hanover* held that it was no defense for a manufacturer to show that the direct purchaser from it had passed on the overcharge to a subsequent consumer. *Illinois Brick* makes the rule work both ways.

■ Judge Flaum read *Illinois Brick*, 431 U.S. at 746, 97 S.Ct. at 2074, to preclude recovery by Fontana from Cessna and CFC regardless of whether or not the middleman, Aviation Activities, Inc., was also alleged to be a member of the conspiracy. We are not satisfied that the *Illinois Brick* rule directly applies in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer.

■ At its present stage this case also appears, for another reason apart from the alleged co-conspiracy intermediary issue, not to fit within the *Illinois Brick* mold of an indirect purchaser suing the manufacturer for an overcharge. Although Fontana is an indirect customer of Cessna for unequipped aircraft, it claims to be a competitor, not a customer, of Cessna in the installation and sale of avionics in those aircraft. Cessna itself justifies its questioned policies as normal business adjustments to meet Fontana's competition. Fontana does not seek damages for an illegal indirect overcharge passed on to it as is prohibited by *Illinois Brick*, but sues on the basis of a combination of acts allegedly causing competitive injury which destroyed its avionics business.

It further appears to us, as Fontana claims on appeal, that the case was decided only on the basis of Cessna's pricing policy to the exclusion of Cessna's other activities all alleged to be aspects of Cessna's and CFC's "multi-faceted conspiracy." Standing separately some of the allegations may be of no antitrust concern, but if all of Cessna's alleged activities were combined and coordinated with the intent to destroy Fontana, its target, as a competitor, the allegations, whatever their merit, should be judged as a whole and not separately. Cessna and CFC argue that Fontana admitted away most of its allegations or otherwise that they were shown to be baseless. Judge Flaum in his order expressed his view that Fontana's allegations were purely cosmetic and that he understood Fontana to be seeking only damages arising from Cessna's pricing policy. Fontana argues that the trial court misconstrued and narrowly construed the amended complaint. In support Fontana points to passages from its memoranda filed in the trial court which espouse the same "multi-faceted conspiracy" theory as urged by Fontana in this court. However, as we examine this case we do not find Fontana to be without some responsibility for the impression the trial judge was given. There is likewise some support for Cessna's and CFC's argument that a few of the allegations were to some extent admitted away in the depositions. However, it seems to us that although some aspects of the allegations were weakened individually,[2] there may be some vitality left in them when considered as parts of the whole conspiracy as alleged. *Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *American Tobacco Co. v. United States*, 147 F.2d 93 (6th Cir. 1944), *aff'd*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

In considering the applicability of summary judgment to this case under rule 56(c), Federal Rules of Civil Procedure, we are not prepared to hold that the record is sufficiently clear and developed for us to make a determination one way or the other

---

**2.** *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980).

as to the alleged conspiratorial motive and intent of Cessna and CFC to destroy Fontana. Those issues usually are not readily susceptible to summary judgment treatment. *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 472–73, 82 S.Ct. 486, 490–91, 7 L.Ed.2d 458 (1962).

Cessna and CFC urge us to apply *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), and hold that Fontana's damages are nothing more than the effect on Fontana's business of non-predatory competition. We are reminded that the antitrust laws are intended to protect competition, not competitors. The district court found it unnecessary to pass on the possible barring of Fontana's damage claim under *Brunswick*. We decline now to apply *Brunswick* on the present record but leave the district court free upon remand to consider its application.

Believing summary judgment to be inappropriate on the present record, we reverse and remand for further proceedings not inconsistent with the views expressed in this opinion. In so doing, we do not intend to imply any view as to the merits of Fontana's case. Upon remand Circuit Rule 18 shall not apply.

REVERSED AND REMANDED.

CASTLE, Senior Circuit Judge, dissenting.

I am unable to agree with the conclusions reached by the majority. For the following reasons, I dissent.

I.

According to the majority opinion, the district court failed to give adequate consideration to Fontana's allegations that Cessna entered into a multifaceted anticompetitive conspiracy against Fontana. The majority then concludes that there is some "vitality" remaining in Fontana's multifaceted conspiracy theory and that there are questions of motive and intent to be decided.

*Hanover Shoe* and *Illinois Brick*

In order to properly analyze the majority's opinion, it is necessary to discuss the decisions in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In *Hanover Shoe* the defendant (United) was alleged to have been a monopolist and was sued for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.[1] United maintained that the plaintiff (Hanover), a direct purchaser from United, merely passed excess costs on to Hanover's own customers. Accordingly, United contended, Hanover was not injured within the meaning of Section 4. The Supreme Court rejected the use of such a "pass-on" defense and held that Hanover had indeed suffered Section 4 damages.

In *Illinois Brick* the plaintiffs, indirect purchasers from the defendants, claimed that the defendants illegally fixed prices. The plaintiffs claimed to have been damaged within the meaning of Section 4 of the Clayton Act because intermediaries in the chain of distribution passed the defendants' illegally fixed prices on to the plaintiffs. The Supreme Court rejected this contention, holding that if a claim that illegal prices were passed on could not be used defensively (the holding of *Hanover Shoe*), such a claim could not be used offensively (as was attempted by the plaintiffs in *Illinois Brick*). Accordingly, the Supreme Court concluded that "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party

---

1. Section 4 of the Clayton Act, 15 U.S.C. § 15, is the general treble damage provision of the antitrust laws. It provides, in pertinent part, that:

> Any person who shall be injured in his business or property by reason of anything

forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

'injured in this business or property' within the meaning of . . . [S]ection [4]." 431 U.S. at 729, 97 S.Ct. at 2066.

In deciding *Illinois Brick*, the Supreme Court noted that allowing *Hanover Shoe* to stand while permitting indirect purchasers to claim damages due to passed-on prices "would create a serious risk of multiple liability for defendants." 431 U.S. at 730, 97 S.Ct. at 2067. The Court also noted that the rationale behind *Hanover Shoe* was equally applicable to both plaintiffs and defendants. A major reason for the decision in *Hanover Shoe*, explained the Court, was "an unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the [indirect] purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." 431 U.S. at 725, 97 S.Ct. at 2064.

### The District Court's Decision

The court below gave full and proper effect to both the relevant precedent and to the claims made by Fontana. The district court's decision was not based on the "vitality" of Fontana's allegations. Nor is the issue in this case whether the allegations made against Cessna are of "antitrust concern." Rather, the issue is whether Fontana has claimed any injuries *other* than those inflicted through Cessna's prices. The district court noted that Fontana's claim for treble damages under Section 4 was only to recover those losses occasioned by Cessna's prices. In light of the fact that Fontana purchased no aircraft directly from Cessna, the district court held that Cessna's prices could not have injured Fontana within the meaning of Section 4 as that section was interpreted in *Illinois Brick*. Accordingly, the district court granted Cessna's motion for summary judgment on Fontana's Section 4 damage claims.

It should be noted that the district court recognized the possibility that it was misconstruing Fontana's claims for damages. Accordingly, the district court gave Fontana leave to file an amended complaint if Fontana wished to allege that it suffered any Section 4 injury based on any of Cessna's actions *other than* Cessna's pricing policies. Fontana did not take advantage of this opportunity. It therefore seems particularly unfair that Fontana should now complain that it was injured by actions taken by Cessna other than Cessna's pricing policy. *See General Teamsters Chauffeurs & Helpers U. v. Blue Cab Co.*, 353 F.2d 687 (7th Cir. 1965). *See also* Wright & Miller, Federal Practice and Procedure § 2716 (1978).

Moreover, neither Fontana nor the majority opinion has demonstrated that the district court erred in its interpretation of Fontana's claims. Fontana's attorney, who was also a shareholder, director and officer of Fontana, stated that "[w]e are not seeking recovery of damages" for any actions taken by Cessna prior to the institution of the Cessna II Marketing Program (CMP) in late 1975. In discussing Fontana's claims for damages under the CMP, Fontana's president discussed the two theories under which Fontana sought damages. Both of those theories dealt with sales lost by Fontana due to the prices charged for Cessna aircraft by Fontana's competitors. The prices charged by Fontana's competitors, in turn, relate back to the prices charged by Cessna to its dealerships under the CMP. Despite this testimony, the majority continues to give weight to claims for damages based on a "conspiracy" which allegedly began in 1974, a year before the institution of the CMP.

### The Applicability of Illinois Brick

Nothing in the majority opinion demonstrates that *Illinois Brick* does not apply to this case. Both *Hanover Shoe* and *Illinois Brick* dealt with the general treble damages provision of the antitrust laws. *Illinois Brick* specifically noted that exceptions to *Hanover Shoe* should be rare and, when created, should be narrowly drawn. 431 U.S. at 745, 97 S.Ct. at 2074. More significant, however, is the fact that the rationale of *Illinois Brick* is fully applicable to Fontana's claims.

As noted above, one basis for the decisions in *Illinois Brick* and *Hanover Shoe* was the inherent difficulty in determining the effect of a manufacturer's prices on an indirect purchaser. 431 U.S. at 725, 731–32, 741–44, 97 S.Ct. at 2064, 2067, 2072. One of Fontana's major claims demonstrates the applicability of that reasoning to this case. Fontana's complaints charged that in 1976 Cessna raised the price of a Model 421 aircraft without optional accessories or avionics to $273,950. At the same time, Fontana continues, Cessna increased the price of a Model 421 with a full accessories and avionics package to $316,950. Fontana then contends that Cessna had been charging $57,235 for the individual accessories and avionics components included in the Model 421; that $316,950 minus $57,235 equals $259,715; and that Cessna was therefore exacting an illegal "penalty" of $14,235. This "penalty" is Fontana's perceived difference between the price of the airplane as part of a package ($259,715) and the price of such an airplane alone ($273,950).

The applicability of *Illinois Brick* becomes apparent when it is revealed that all of these claims are based on the manufacturer's suggested retail price. In an affidavit, Cessna's Senior Vice-President of Marketing stated that Cessna charged its independent dealerships the same price for Model 421 aircraft regardless of whether or not the aircraft was purchased as part of a package. The only difference was that Cessna gave the dealers a discount of $2,747 if the aircraft was purchased with avionics. Additionally, Cessna reduced the price it charged dealerships for accessories and avionics by $5,732. However, even after the price reductions, the difference between the amount Cessna charged its dealers and the suggested retail price varied between $54,000 and $63,000. Thus, the $14,000 "penalty" or "overcharge" alleged by Fontana was imposed, not by Cessna, but by independent Cessna dealerships. These dealerships could have absorbed this entire difference, if they so desired, by altering their markup on avionics equipped and unequipped aircraft. The impossibility of determining the effect of Cessna's prices upon Fontana is evident. Accordingly, *Illinois Brick* should fully apply to any Section 4 damages which Fontana claims were inflicted upon it through Cessna's pricing policies.

### Fontana's "Competitor" Status

Fontana also argues that *Illinois Brick* should not apply here because Fontana competed with Cessna in the sale of avionics for Cessna aircraft. However, Fontana's competitor status should not affect the applicability of *Illinois Brick* to those Section 4 damages which Fontana seeks due to Cessna's prices. *Illinois Brick* appears to have dealt with all purchasers seeking Section 4 damages based on the prices charged by indirect sellers. As indicated by the district court, Fontana was free to seek recovery of those losses actually occasioned by any anticompetitive acts, aside from Cessna's pricing policies, committed by Cessna. Those acts, described in the majority opinion, included product disparagement and territorial restrictions. However, Fontana's only claimed damages under Section 4 were due to Cessna's prices. *Illinois Brick* squarely prevents Fontana from recovering these damages.

An additional point is the meritless nature of Fontana's alleged competitor status. Fontana sold all of its aircraft and avionics at the retail level; Cessna sold neither aircraft nor avionics at the retail level. Indeed, Fontana is no more a competitor of Cessna's than is any retailer who, in purchasing various components of a product line from various manufacturers, only buys portions of the product line from each manufacturer. An example of the fallacy of Fontana's competitor argument is *In Re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1978). The *Beef Industry* case plaintiffs included parties that raised cattle. The defendants included twenty-five supermarket chains. Under Fontana's theory the plaintiffs (who were concerned with selling as much beef as possible) competed with the defendants (who sold foods which competed with beef). Despite this "competition" between the plaintiffs and the defendants, the Fifth Circuit ruled that the plaintiffs' claims for damages were within the ambit of *Illinois*

*Brick.*[2] Therefore, even if "competitor" status does affect the application of *Illinois Brick* to a claim for Section 4 damages, Fontana is not entitled to that status.

## II.

I also disagree with the majority's decision not to reach the applicability to this case of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The *Brunswick* issue was addressed in the briefs filed before this Court. Additionally, the record before this Court includes the briefs which the parties filed with the district court on the applicability of *Brunswick.* Finally, I fail to see how the disposition of the *Brunswick* issue will be aided by any further development of the facts of this case.

**2.** The Fifth Circuit went on to hold that the *Illinois Brick* cost-plus contract exception applied. However, that exception was not raised before this Court and is not applicable to the case at hand.