In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2925

Paper Systems Incorporated, Graphic Controls
Corp., and Victor Paper Roll Products, Inc.,

Plaintiffs-Appellants,

v.

Nippon Paper Industries Co., Ltd.,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
Nos. 96-C-959 et al.--Lynn Adelman, Judge.

Argued January 17, 2002--Decided February 6, 2002

   Before Flaum, Chief Judge, and Bauer and
Easterbrook, Circuit Judges.

   Easterbrook, Circuit Judge.  Five
manufacturers of thermal facsimile paper-
-a product now obsolete--are accused in
this class action of conspiring to reduce
output and raise price in this business
from 1990 to 1992. The paper business has
a long history of cartelization; criminal
prosecutions and civil antitrust actions
are depressingly common. In 1995 the
Department of Justice brought a criminal
prosecution against the major producers
of thermal fax paper. Nippon Paper
Industries (known until recently as Jujo
Paper) was among the defendants. See
United States v. Nippon Paper Industries
Co., 109 F.3d 1 (1st Cir. 1997). Although
it was acquitted, see 62 F. Supp. 2d 173
(D. Mass. 1999), this does not foreclose
civil litigation, which employs a lower
burden of persuasion. Nippon Paper
prevailed in this action, too, and
without a trial, because the district
judge concluded that the direct-purchaser
rule of Illinois Brick Co. v. Illinois,
431 U.S. 720 (1977), and Kansas v.
Utilicorp United Inc., 497 U.S. 199
(1990), precludes recovery. 2000 U.S.
Dist. Lexis 4535 (E.D. Wis. Mar. 30,
2000). After the remaining defendants
settled, the plaintiffs appealed the
dismissal of their claim against Nippon

Paper.

   The five manufacturers use different distribution systems. Kanzaki Specialty Papers, Inc., and Appleton Papers, Inc., sell directly to firms such as plaintiffs. (Our plaintiffs resold fax paper to their own customers, but under Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968), they are entitled to collect damages without reduction to account for the possibility that they passed the overcharge on to their own customers. The first buyer from a conspirator is the right party to sue. In other words, Hanover Shoe holds that there is no passing-on defense, while Illinois Brick and Utilicorp establish that indirect purchasers cannot use a passing-on theory offensively.) Two other manufacturers, Oji Paper Co. and Mitsubishi Paper Mills Ltd., sell exclusively to trading houses, which resell to firms such as plaintiffs. Oji sold only to Elof Hansson Paper & Board, Inc., while Mitsubishi Paper sold exclusively to Mitsubishi Corp. in Japan, which resold exclusively to Mitsubishi International Corp. in the United States. The complaint alleges that Elof and the two Mitsubishi trading firms are members of the conspiracy, which makes plaintiffs the first purchasers from outside the conspiracy. The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator "exception" to Illinois Brick, but it would be better to recognize that Hanover Shoe and Illinois Brick allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages. Perhaps if a conspirator defects and sues its former comrade, that snitch would come to own the right to damages, but Elof and the Mitsubishi trading houses did not change sides and align themselves as plaintiffs. Thus our plaintiffs are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established. See Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478, 481 (7th Cir. 1980); In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599, 604 (7th Cir. 1997); Phillip E. Areeda & Herbert Hovenkamp, II Antitrust Law para.para. 346f, 346h (rev. ed. 2000).

   Nippon Paper, the fifth manufacturer,

sold its output in Japan to Japan Pulp & Paper Co. and Mitsui & Co., which resold through subsidiaries around the world. Neither Japan Pulp & Paper nor Mitsui is alleged to have participated in the conspiracy. As a result, Hanover Shoe and Illinois Brick allocate to them any right to collect overcharges attributable to Nippon Paper's sales. Neither of these firms joined the suit or expressed any interest in suing, so no damages may be awarded to the three plaintiffs (or any class member) on account of Nippon Paper's sales. The district court understood this to mean that Nippon Paper cannot be liable. Yet all that Hanover Shoe and Illinois Brick establish is that the direct purchasers (here, Japan Pulp & Paper and Mitsui) own the right to damages on account of particular sales. Nothing in Illinois Brick displaces the rule of joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output. See Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630 (1981). Our three plaintiffs, and members of their class, hold rights to recover on account of purchases directly from Kanzaki and Appleton, and (through other conspirators) from Oji and Mitsubishi. If they can prove that there was indeed a conspiracy, they may collect damages not just firm-by-firm according to the quantity each sold, but from all conspirators for all sales. If Nippon Paper was among those conspirators, then it is responsible for the entire overcharge of all five manufacturers--and any direct purchaser from any conspirator can collect its own portion of damages (that is, the damages attributable to its direct purchases) from any conspirator. This makes it impossible to dismiss Nippon Paper outright.

Recognizing the normal effects of joint and several liability, Nippon Paper contends that Illinois Brick creates an exception. If it is liable at all, it insists, judges or juries will have to trace the original overcharge through several levels of distribution to determine what damages it caused. The difficulty of figuring out how much was passed on, and how much swallowed by a distributor, is one major reason that Illinois Brick came out as it did. That's true enough, but it does not justify

abandonment of the joint-and-several-liability norm. Every firm sells indirectly in some respect. All products of this industry went through multiple hands; the plaintiffs are themselves distributors. If the presence of any wholesaler or retailer in the chain of distribution creates complications too great to allow joint liability, then the norm that every conspirator is responsible for the acts of every other would be overthrown.

Illinois Brick and Hanover Shoe together do three things. First, they concentrate damages in the hands of the initial purchasers, and thus improve deterrence. Firms that deal directly with the manufacturers are apt to know the most about the industry's behavior and thus are in the best position to detect cartels; allowing them to collect the full overcharge, trebled, creates powerful incentives to investigate and file suit. See William M. Landes & Richard A. Posner, Should Indirect Purchasers Have Standing To Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick, 46 U. Chi. L. Rev. 602 (1979). The prospect of recovery also acts like a cents-off coupon to the initial buyer, which given competition at the distribution stage is forced to pass on this anticipated discount, and so protects remote customers from the effects of the cartel if deterrence fails.

Second, these cases prevent double recoveries. Hanover Shoe allows the first purchaser to recover the whole overcharge even if some was passed on to its customers. Had Illinois Brick allowed indirect purchasers to recover for the portion passed on to them, the total recovery would have exceeded the treble damages provided by the Sherman Act--unless Hanover Shoe was overruled and the take of the initial purchaser curtailed. Here is where the third consideration comes in. If Hanover Shoe was to be modified to avoid duplicative recovery, how would that be done? How much of any overcharge is passed on depends on the elasticities of supply and demand in the chain of distribution, which are exquisitely hard to pin down. The Supreme Court concluded that the game is not worth the candle--even, Utilicorp held, in the simplified case of a utility operating under rate regulation that is designed to cause a complete pass-on.

Changes in market conditions after regulators set rates meant that the design might not be fulfilled. It is better, the Court held in both Illinois Brick and Utilicorp, to avoid these complications and concentrate damages in the hands of the initial purchasers so as to maximize deterrence.

Joint and several liability is another vital instrument for maximizing deterrence. See Lewis A. Kornhauser & Richard L. Revesz, Sharing Damages Among Multiple Tortfeasors, 98 Yale L.J. 831 (1989). Holding Nippon Paper jointly and severally liable with the other four manufacturers, for the conspiracy's entire sales, is compatible with Hanover Shoe, Illinois Brick, and Utilicorp. Certainly it does not undermine these decisions, which are themselves designed to improve deterrence. Nor does this suit pose any risk of double recovery; sales to Japan Pulp & Paper and Mitsui have been carved out of the case, because those entities own the right to recover on account of their own purchases. The difficulty of tracing overcharges through the chain of distribution therefore is unimportant; duplicative recovery has been blocked at the outset. It remains necessary to determine the amount of the overcharge, and if this cannot be established in any other way (for example, by the conspirators' own agreement) then it is necessary to determine the elasticities of supply and demand. But this prospect is present in every cartel case; it is not occasioned solely by the presence of intermediaries. The monopoly overcharge is the excess price at the initial sale--here, from the five manufacturers to their initial customers. Calculations are complicated by the fact that two of the five (Appleton and Kanzaki) provide some distribution services, and thus may charge higher initial prices than do the other three. But disaggregating these expenses to impute a transfer price from the manufacturing to the distribution arm of the two vertically integrated firms does not transgress Illinois Brick because the process cannot lead to multiple recovery.

A simple example makes the point. Suppose that five vertically integrated manufacturers sell directly to consumers at $12 per unit, and that this price is

an overcharge attributable to a cartel; the competitive price would have been $10 per unit. Each manufacturer sells 100 units per year, so the total overcharge is $1,000 ($2 on each of 500 units) and treble damages under the Sherman Act are $3,000. Given joint and several liability, each of the five conspirators is liable to pay the whole $3,000--though no consumer can recover more than $6 per unit purchased. Now suppose further that one of the five manufacturers gets out of the distribution business and sells its output to a wholesaler for $10 per unit; the wholesaler resells the product for $12 per unit. It is hard to see why this should change the total damages any conspirator must pay under the antitrust laws. According to Hanover Shoe and Illinois Brick, it changes who may collect damages (the wholesaler, as direct purchaser, owns the right to collect damages on 100 units each year) but not how much each cartelist owes in the aggregate. Yet Nippon Paper's position is that the use of a wholesaler has a profound effect; it reduces that manufacturer's total exposure from $3,000 to $600 (treble the $2 overcharge on 100 units sold to the wholesaler)--and then only if the wholesaler sues. This would be economically identical to a system of full contribution and indemnity among antitrust offenders, with each firm bearing liability only in proportion to its market share. Texas Industries rejected just such a proposal. Nothing in Illinois Brick requires that the approach disapproved by Texas Industries be implemented under a different name. All that Illinois Brick means is that, if one direct purchaser wholesaler declines to sue, then the total damages the five example manufacturers owe jointly and severally cannot exceed what is recoverable by direct purchasers that do litigate (in our example, for $2,400). Every participant in the conspiracy remains liable for damages on every sale to every direct purchaser from any of the manufacturers.

If Nippon Paper participated in a cartel of thermal fax paper (something that remains to be determined) then it is jointly and severally liable for the cartel's entire overcharge. That the plaintiffs did not buy from Nippon Paper directly, or at all, does not matter. As long as Nippon Paper's direct customers

hold the exclusive right to damages for its own output, the holding and goals of Illinois Brick have been satisfied. It was improper to dismiss Nippon Paper as a defendant while its status as a member of the cartel remains to be determined.

Reversed and Remanded