GREGORY, Circuit Judge,
dissenting.
I agree with the majority, ante at 202, that Gravity’s § 1 claims need not meet the more rigorous standards of § 2 of the Sherman Act. However, I respectfully dissent. Whether or not Gravity would succeed on the merits, it has clearly stated claims under both § 1 and § 2 of the Sherman Act.
I.
The majority makes its first error when it rejects Gravity’s allegations of a single conspiracy, relying on Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In Kotteakos, the Supreme Court rejected one articulation of a “rimless wheel” conspiracy. The conspiracy envisioned — and rejected — by Kottea-kos states: “A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant’s involvement in each transaction.” Ante, at 202-203. The majority says that because the Kotteakos Court rejected a variant of a “rimless wheel” conspiracy, we must too. The problem with that reasoning is that Gravity is not arguing that we should adopt the specific definition of conspiracy that was rejected in Kotteakos.
In Kotteakos, the underlying crime was conspiracy to obtain loans under the National Housing Act by false and fraudulent statements. The center of the conspiracy was a man named Brown, who was in the business of brokering fraudulently obtained loans for his co-conspirator clients. 328 U.S. at 753, 66 S.Ct. 1239. All of the clients used Brown to obtain the loans, but each client’s use of Brown’s services was independent of every other client’s use. Id.Kotteakos involved not one, but multiple conspiracies. Not only did Brown’s co-conspirators have no express agreements among themselves, their participation was also in no way dependent on the participation of other users of Brown’s services. The Court drew upon an analogy offered by the court of appeals to explain the point: “Thieves who dispose of their loot to a single receiver — a single ‘fence’ — do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a ‘fence’ to make them such.” Id. at 755, 66 S.Ct. 1239.
In contrast to Kotteakos, Gravity outlined the elements of a “rimless wheel” conspiracy as follows:
*217 (1) that there is an overall — unlawful plan or common design in existence;
(2) that knowledge that others must be involved is inferable to each member because of his knowledge of the unlawful nature of the subject of the conspiracy [,] but knowledge on the part of each member of the exact scope of the operation or the number of people involved is not required; and
(3) there must be a showing of each alleged member’s participation.
Elder-Beerman Stores Corp. v. Federated Dep’t Stores, Inc., 459 F.2d 138, 146-47 (6th Cir.1972) (emphasis deleted and added); Impro Prods., Inc. v. Herrick, 715 F.2d 1267, 1279 (8th Cir.1983) (quoting Elder-Beerman). Whether we should adopt this test in toto I would not decide today, but I believe that this definition of a “rimless wheel” conspiracy is useful for purposes of this case, and is consistent with well-established interpretations of the Sherman Act.
The critical difference between the test Gravity urges, and the test Kotteakos rejected lies in the requirement “that knowledge that others must be involved is infer-able to each member because of his knowledge of the unlatvful nature of the subject of the conspiracy ” (emphasis added). Id. Gravity has alleged that the nature of the conspiracy, by design and by necessity, was broader than any one agreement between Microsoft and an OEM, and that knowledge of that interdependent design was inferable to each member of the conspiracy. Regardless of whether any OEM desired the participation of other OEMs (and they conceivably might have), Gravity alleges that each OEM joined a conspiracy which it knew was, by its nature, broader than just itself and Microsoft.
These allegations are plainly sufficient to state a claim under the Sherman Act. The law has been clear that there need not be an express agreement between every conspirator in order for a single conspiracy to be formed. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610 (1939) (“[I]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators”); see also United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942) (“Here, as in Interstate Circuit, ... [i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.”); United States v. Tillett, 763 F.2d 628, 632 (4th Cir.1985) (stating that plaintiff must show that each alleged conspirator “participated in the conspiracy with knowledge of the essential nature of the plan.”).
In Interstate Circuit, Inc. v. United States, film exhibitors suggested that film distributors insert clauses into their distribution contracts requiring minimum ticket prices for certain films. The distributors accepted the suggestion nearly unanimously. The Court held that an agreement among the distributors could be inferred:
Each [distributor] was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions ... there was risk of a substantial loss of the business and good will of the ... exhibitors, but that with it there was the prospect of increased profits.
306 U.S. at 222, 59 S.Ct. 467. Such is the case with the OEMs. It takes no stretch of logic to infer that the OEMs knew that Microsoft’s plans contemplated the cooperation of other OEMs. It is the agreement to participate in this common plan that formed a single conspiracy. “Acceptance by competitors, without previous agree *218 ment, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.” Interstate Circuit, 306 U.S. at 227, 59 S.Ct. 467. Thus, I would find that the allegations are sufficient to state a claim.
II.
The majority next finds that Gravity has failed to allege “facts which, if proven true, would establish that the two conspiracies separately imposed unreasonable restraints of trade in interstate commerce.” Ante, at 205. Even if I agreed that there were two conspiracies and not one alleged in this case, there is no question that Gravity’s pleadings are more than adequate.
The majority requires far more from Gravity than is appropriate under notice pleading standards. Aside from a statement of jurisdiction and a demand for relief, Federal Rule of Civil Procedure 8(a) requires nothing more than “a short and plain statement of the claim showing that the pleader is entitled to relieff.]” 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1. The elements for a claim of conspiracy to restrain trade in violation of § 1 of the Sherman Act are (1) concerted action that (2) unreasonably restrains trade. Estate Constr. Co. v. Miller Smith Holding Co., 14 F.3d 213, 220 (4th Cir.1994); Oksanen v. Page Memorial Hosp., 945 F.2d 696, 702 (4th Cir.1991). According to the majority, Gravity has not adequately pled the second element, an unreasonable restraint of trade, because Gravity failed to plead the market shares of the OEMs. This is necessary, the majority says, because Gravity must prove the OEMs’ individual market power in order to prove the conspiracy’s market power. The conspiracy’s market power, in turn, is required to prove the potential for anticompetitive effects, which is part of Gravity’s burden to satisfy the “rule of reason.”
The majority’s pleading standard conflicts with the Supreme Court’s recent pronouncement on federal pleading requirements. “[Ujnder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case.” Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002). “This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.” Id. at 998. “Rule 8(a)’s simplified pleading standard applies to all civil actions, with certain exceptions.” Id. Thus, the Supreme Court has made crystal clear, just this past term, that an evidentiary standard does not determine the adequacy of a complaint. Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002). It is inappropriate, therefore, to require plaintiffs to plead facts going to that evidentia-ry standard in a complaint.
While I agree that liability in this case, in all likelihood, would be determined under the “rule of reason” standard, see, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), it seems to me that the “rule of reason” is an evidentiary standard, not a pleading requirement. Courts ordinarily have to undertake a factual inquiry before it is determined whether the “rule of reason” or per se rules apply. If per se rules apply, then anticompetitive effects do not matter. See United States v. W.F. Brinkley & Son Constr. Co., Inc., 783 F.2d 1157, 1162, n. 10 (4th Cir.1986) (noting this circuit recognizes per se antitrust violations and, in doing so, there is no requirement of proof of anticompetitive results). The conduct is illegal regardless of proof of effects. Id.
*219 Additional specificity regarding the OEMs’ market power is not necessary. While anticompetitive effect is often proven through analysis of the relevant market definition and market power, it can also be proven through actual anticompetitive effects. FTC v. Indiana Fed’n of Dentists, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); VII P. Areeda, Antitrust Law § 1511, p. 429 (1986). The Supreme Court made clear that it is inappropriate to require a plaintiff to plead facts which he may not need to succeed on the merits of the claim. Swierkiewicz, 122 S.Ct. at 997 (holding that plaintiff need not plead facts establishing a prima facie case of employment discrimination, in part because it would be “incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered”). Gravity has pled actual anticompetitive effects. See Compl. ¶¶ 4, 59, 62-63, 68-69, 91-92, 95, 107, 115-117, 123-124, 150, 152, 154-156. Accordingly, the complaint should withstand a motion to dismiss.
To the extent that Gravity intends to rely on market power to demonstrate the likelihood of significant anticompetitive effects, the relevant issue is whether the conspiracy had market power in the software markets, not whether the defendant OEMs had market power in th'e PC hardware market. Gravity has adequately pled the conspiracy’s market power. See, e.g., Compl. ¶ 150 (“Microsoft and these named co-conspirators have the power to control prices or exclude competition in these relevant markets and have committed overt acts in furtherance of their conspiracy to monopolize.”); id. ¶ 152 (“[The OEMS] are Microsoft’s three largest distributors in the relevant market for Microsoft operating software, and among Microsoft’s very largest distributors in the relevant markets for the sale of personal computer word processing and spreadsheet software. As participants in these markets they have joined Microsoft in extensive licensing and other agreements with the purpose and effect of monopolizing and restraining trade in these relevant markets, and they have benefitted substantially from this common anticompeti-tive scheme.”).
The Court finds Gravity’s allegations of market power deficient, but only because it misunderstands Gravity’s argument regarding market power. According to the majority, Gravity argued on appeal that Microsoft’s monopoly is the only relevant factor in determining whether the conspiracy had the power to harm competition. This is not correct. Gravity has asserted that the district court was wrong to require it to plead that each OEM defendant had sufficient market power in the hardware market to cause the injury alleged, pointing out that the relevant market is software, and the relevant entity is the conspiracy (either a bilateral or single conspiracy). Appellant’s Br. at 46, 48, 49; id. at 50 (“The district court erred in assessing only Compaq’s or Dell’s market power rather than the market power of the combinations between each of them and Microsoft.”). It is clear that Gravity understands the importance of the OEMs, and the pleadings, read in the light most favorable to Gravity, do not suggest otherwise. See also Fed.R.Civ.P. 8(f) (“All pleadings shall be so construed as to do substantial justice.”).
Setting aside any confusion regarding Gravity’s argument, the majority has identified an important issue concerning market power. While Microsoft has a monopoly in the relevant software markets, if the conspiracy included only minor OEMs, then the conspiracy would presumably have no power to cause significant anti- *220 competitive effects. See ante, at 209-210 n. 20. The parties dispute whether this should be treated as a liability issue or a causation issue, Appellants’ Br. at 7; Ap-pellees Compaq, Dell, and PB Electronics’ Br. at 28, and the majority does not resolve the dispute, ante at 207-208 n. 19. The heading under which the issue should go is ultimately irrelevant because the majority identifies only a single deficiency in Gravity’s pleadings: failure to plead the defendant OEMs’ market shares in the PC market. Ante at 211. Yet this is not enough to entitle the defendants to a dismissal.
The complaint identifies the OEMs involved, states that they are Microsoft’s largest OEM distributors, identifies the asserted anticompetitive conduct, states that the conspiracy’s anticompetitive conduct had significant anticompetitive effects, and identifies the effects. Moreover, Microsoft is an adjudicated monopolist, with clear market power in the relevant software markets, and the defendant OEMs are among the largest players in the PC hardware market. There is simply no conceivable argument from which one could conclude, based solely on a failure to plead market share, that the defendants are not on notice of the claims against them and the grounds on which they rest. See Conley, 355 U.S. at 48, 78 S.Ct. 99 (“The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.”). The OEMs’ specific market power in the PC market is, at best, a subsidiary fact.
The majority cites a number of cases involving pleading standards. See ante at 211-213. None of those cases, however, support the holding in this case. For example, it is true that in Advanced HealthCare Services, Inc. v. Radford Community Hospital, 910 F.2d 139 (4th Cir.1990), we stated that a plaintiff must “colorably state[ ] facts which, if proven, would entitle him to relief.” Id. at 145 n. 8. But, in that case, we .reversed the district court’s dismissal of the complaint, acknowledging that “the Supreme Court has stated that ‘dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.’ Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 747, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).” Id. at 144. Lack of specificity in the complaint was not the concern of that case. This Court never suggested that a plaintiff must plead detailed facts supporting every subsidiary factual conclusion. To the contrary, we employed a decidedly permissive standard for judging the adequacy of the complaint. In Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213 (4th Cir.1994), we confirm that a complaint must provide “sufficient facts so that each element of the alleged antitrust violation can be identified,” id. at 222 (internal quotation and citation omitted); but we never suggested that detailed, underlying facts are required in the complaint. Rather, our concern was with overly vague factual allegations and mere legal conclusions unsupported by any facts.
The full Sherman Act allegations in that case read as follows:
Providence combined and/or conspired with the Miller & Smith defendants, Gordon V. Smith, Calloway, Connor, Jack B. Conner Associates, Inc. and others to restrain trade unreasonably in the Washington, D.C. metropolitan area by combining and/or conspiring to deprive the Pattersons of The Property, cause The Property to be sold in foreclosure at a price that would leave the Pattersons with no assets, and otherwise to drive them and Estate Construction out of the *221 real estate development business in the Washington, D.C. metropolitan area. The combination and/or conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market. The objects and conduct of the combination and/or conspiracy were illegal.
14 F.3d at 221 n. 15. We held that a plaintiff must “provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken place.” Id. at 221. Gravity’s claims, in contrast, are replete with all manner of detail — fifty-eight pages of detail.[1] The defendants in this case know exactly what conduct is alleged to have violated the antitrust laws, which is all that Rule 8 requires. It is not for us to change the rules of civil procedure mid-stream. “A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.” Swierkiewicz, 122 S.Ct. at 999.
III.
Finally, the majority holds that the direct purchaser rule of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), precludes recovery. I disagree, and would join the Seventh, Ninth, and Eleventh Circuits, each of which has held that it does not. Paper Systems, Inc. v. Nippon Paper Indus. Co., Ltd., 281 F.3d 629 (7th Cir.2002); Lowell v. American Cyanamid Co., 177 F.3d 1228, 1233 (11th Cir.1999) (“Illinois Brick simply does not apply where the complaint alleges a vertical conspiracy with no pass-on.”); In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 604 (7th Cir.1997) (Posner, C.J.) (“[A]ny indirect-purchaser defense would go by the board since the [plaintiffs] would then be direct purchasers from the conspirators.”); Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1212-14 (9th Cir.1984); Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478, 481 (7th Cir.1980); see also II Phillip E. Areeda et al., Antitrust Lato ¶ 346h, at 369 (2d ed. 2000) (“Whether one adopts a co-conspirator exception or regards this situation as outside Illinois Brick’s domain, there is no tracing or apportionment to be done.”); cf. McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 855 (3d Cir.1996) (noting exception but declining to apply it because the upstream suppliers were not joined as defendants); In re Beef Antitrust Litig., 600 F.2d 1148, 1163 (5th Cir.1979) (same); Jewish Hosp. Ass’n v. Stewart Mech. Enters., 628 F.2d 971, 977 (6th Cir.1980) (noting exception but declining to apply it because vertical conspiracy allegations failed).
The decision in Hanover Shoe was motivated by the Court’s desire to maximize deterrence by allocating the right to sue to the most efficient enforcer of antitrust law. The rationale was that indirect purchasers have a comparatively small injury, and consequently less incentive to sue. Hano *222 ver Shoe, 392 U.S. at 494, 88 S.Ct. 2224; Illinois Brick, 431 U.S. at 745, 97 S.Ct. 2061. A passing-on defense would make litigation less effective for direct purchasers as well, given the reduction in recovery as well as the complexities of apportioning damages between direct and indirect purchasers. Hanover Shoe, 392 U.S. at 493, 88 S.Ct. 2224. Illinois Brick is the logical corollary to Hanover Shoe. In Illinois Brick, the Court denied “passed-on” damages to indirect purchasers of a manufacturer’s goods. Because of Hanover Shoe, failure to deny recovery for such damages would lead to duplicative recovery. Illinois Brick, 431 U.S. at 730-31, 97 S.Ct. 2061. The two cases therefore ensure full recovery while maximizing deterrence and avoiding duplicative recovery.
Permitting plaintiffs such as Gravity to sue intermediaries that were part of a conspiracy to raise retail prices above a competitive level is consistent with Hanover Shoe and Illinois Brick. As Judge Easter — brook recently wrote for the Seventh Circuit: “The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator ‘exception’ to Illinois Brick, but it would be better to recognize that Hanover Shoe and Illinois Brick allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages.” Paper Sys., 281 F.3d at 631-32. This is the correct reading of Hanover Shoe and Illinois Brick. It maximizes deterrence by giving the right to sue to the plaintiff with the most incentive to sue. As for any lingering doubt over whether the conspiring intermediary is the best plaintiff, or concern regarding multiple recovery, the case law has rightly recognized the importance of joining the intermediary in the suit — a requirement which has been met in this case. See, e.g., McCarthy, 80 F.3d at 855; In re Beef Antitrust Litig., 600 F.2d at 1163; In re Midwest Milk Monopolization Litig., 730 F.2d 528, 531 (8th Cir.1984).
The majority rejects the cases that have unanimously recognized a direct purchaser’s right to sue, saying that those cases dealt with price-fixing conspiracies. I think that this case presents a substantially identical situation. Gravity is not complaining about any overcharge paid by the OEMs to Microsoft. Rather, Gravity is complaining about the conspiracy’s ultimate overcharge of the consumer. Gravity actually argues that the defendant OEMs received discounts on software purchased from Microsoft. In other words, Microsoft shared some of the monopoly profits with the OEMs. If one were to assume that Microsoft gave all its monopoly profits to the OEMs then there would be no pass-on. The OEMs would simply be overcharging consumers, like in a resale price maintenance scheme. How much of its monopoly profits Microsoft retained is merely a matter of how the conspirators allocated the fruits of their alleged illegality, and is not directly relevant to Gravity. The damages that Gravity is seeking to prove are the difference between the price consumers actually paid for the Windows software and the “but for” price.
Much of the difficulty in calculating the “but for” price will come from disaggregat-ing the price of PC hardware from the Microsoft software. This difficulty, however, is not the concern of Illinois Brick. It can occur when there is no middleman. It would occur, for example, if Microsoft built and sold its own brand of Windows-operated PC. Mere difficulty in measuring damages is not a reason to preclude recovery. See Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (“[I]n cases where a wrongdoer has incorporated the subject of a plaintiffs patent or trademark in a single product to which the defendant had contributed other *223 elements of value or utility ... this Court has sustained recovery of the full amount of defendant’s profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits”) (citations omitted); J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566-67, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (“[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which has itself inflicted.”) (quotation omitted).
Aside from the problem of disaggregation, calculating the “but for” price may involve determining elasticities of supply and demand — the complexity identified by Illinois Brick — but no more so than in any of the other cases in which middlemen conspired with manufacturers. And there will be no duplicative liability. Moreover, determining elasticities of supply and demand can complicate any attempt to measure damages — “it is not occasioned solely by the presence of intermediaries.” Paper Sys., 281 F.3d at 633. The real concern of Hanover Shoe and Illinois Brick is the complexity of measuring the pass-on of an actual overcharge, and its potential negative effect on deterrence and compensation, not the mere difficulties of determining what the price would have been in a competitive market.[2] The majority’s rule is essentially a free pass to any conspiracy that can make the damage it inflicts difficult to pin down. Until now, that has never been the law.
The majority reasons that adopting Gravity’s argument would lead plaintiffs to plead a conspiracy that did not exist in order to evade Illinois Brick. Yet, there are mechanisms, primarily Rule 11, to deal with the abusive and unethical conduct of litigants and lawyers. I find troubling the majority’s unhesitating willingness to cut off compensation to all injured consumers based on hypothetical abuses of liberal pleading rules. The interests of consumers are far more weighty than the majority is willing to recognize. Moreover, the concern about “artful pleading” has nothing whatsoever to do with Illinois Brick and Hanover Shoe. The direct purchaser rule is designed to encourage and incentivize private enforcement of the antitrust laws, not immunize corporate wrongdoers from having to litigate antitrust claims.
IV.
The most unfortunate aspect of this case is that, to the extent Gravity’s claims have merit, consumers will be left uncompensated. Even more, raising the procedural bar for consumers’ claims may further stifle technological innovation. By giving comfort to those entrenched interests that seek to protect the status quo, today’s decision increases the likelihood of future anticompetitive conduct. To those who would introduce disruptive technologies, this ruling creates a strong disincentive to innovate. Without innovation, we all lose. I respectfully dissent.

. The majority also parenthetically quotes Mun. Utils. Bd. of Albertville v. Alabama Power Co., 934 F.2d 1493, 1501 (11th Cir.1991): "A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified. ’' Ante at 212-213. But the majority omits the important qualifier contained in the same paragraph: "However, the alleged facts need not be spelled out with exactitude, nor must recovery appear imminent.” Mun Utils. Bd, 934 F.2d at 1501. Finally, Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984), stands for the unexceptional and well-worn proposition that a plaintiff must at least "outline or adumbrate" a violation of the Sherman Act, instead of relying on a bare legal conclusion. Id.

. To the extent that the litigation subsequently revealed true Illinois Brick issues, such as if the defendant OEMs switched sides and sued Microsoft, see Paper Sys., 281 F.3d at 632, I agree that Illinois Brick might then require dismissal of Gravity's claims.