In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2619

MCGARRY & MCGARRY, LLC,

*Plaintiff-Appellant*,

*v.*

BANKRUPTCY MANAGEMENT SOLUTIONS, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 17 CV 5779 — **Joan H. Lefkow**, *Judge*.

ARGUED NOVEMBER 7, 2018 — DECIDED SEPTEMBER 5, 2019

Before ROVNER, SYKES, and BARRETT, *Circuit Judges*.

SYKES, *Circuit Judge*. McGarry & McGarry, LLC, a creditor in a closed Chapter 7 bankruptcy case, tried three times to bring a price-fixing claim against Bankruptcy Management Solutions, Inc. ("BMS"), the trustee's software-services provider. In the first suit, McGarry alleged claims under the Sherman Act and the Illinois Antitrust Act. Because McGarry is not a direct purchaser of bankruptcy software services, the district court dismissed the Sherman Act claim, *see Ill. Brick*

*Co. v. Illinois*, 431 U.S. 720 (1977), and relinquished jurisdiction over the state-law claim.

McGarry tried a different tack and moved to reopen the bankruptcy proceedings. The bankruptcy court denied that request because the case had been closed for more than three years. Undeterred, McGarry filed a new lawsuit in state court alleging a stand-alone claim under the Illinois Antitrust Act. The state statute has an "*Illinois Brick* repealer" provision that permits indirect purchasers to sue. BMS removed the case to federal court and moved to dismiss. The district judge granted the motion because McGarry is not even an *indirect* purchaser of bankruptcy software services; it does not purchase these services at all. McGarry appealed.

We affirm. McGarry is a one-time creditor in a closed Chapter 7 bankruptcy case. It does not participate in the market for bankruptcy software services in any way that would make it a proper plaintiff to bring an antitrust claim against a firm that provides those services to bankruptcy trustees.

## I. Background

A Chapter 7 bankruptcy petition creates a bankruptcy estate, which becomes the temporary legal owner of the debtor's property. 11 U.S.C. § 541(a). When a petition is filed, the Executive Office of the U.S. Trustee (a division of the U.S. Department of Justice) appoints a trustee to administer the estate. The trustee collects and liquidates nonexempt estate assets to maximize the return to creditors. The trustee also files periodic reports with the bankruptcy court and the U.S. Trustee. *Id.* § 704.

The reports are prepared on special software, and trustees typically use one of three providers to supply these services. BMS is the largest supplier of bankruptcy software services. The complaint alleges that BMS has a market share of approximately 50% as measured by the total number of bankruptcy trustees in the country. Epiq Systems and TrusteSolutions have 35% and 15%, respectively. A trustee normally does not use more than one software-services provider at any one time.

For many years BMS partnered with banks to jointly deliver services to the estate. Under this model BMS directed the trustee to deposit the estate's funds into a partner bank, and in return the trustee received integrated case-management and banking services. The bank earned money from the deposit and paid interest to the estate and a fee to BMS. This business model relied on the existence of a "spread" between the interest the bank could charge its borrowers and the interest it paid to its depositors. The model worked well as long as interest rates remained high enough to support the bank's flexibility to work within the spread, allowing all parties to prosper.

But the model collapsed with the economic downturn in 2008. Interest rates declined precipitously from more than 4% in late 2007 to near 0% one year later, so the spread evaporated. BMS had to adapt to a new reality. It soon designed a different business model: it would sell its software services in combination with banking services (as it had in the past), but the bank would charge a set percentage of the estate's funds as a fee for the combined services and pay a portion of that fee to BMS. For this new model to work, however, BMS had to overcome two obstacles. First, it

needed its competitors to also adopt the new arrangement. The complaint alleges that sometime before 2011 BMS approached Epiq Systems and TrusteSolutions and proposed the new billing model. Both agreed to implement a similar system.

Second, BMS needed the Executive Office of the U.S. Trustee to suspend its rule prohibiting trustees from using estate funds to pay bank fees. All three providers asked the Executive Office to do so. In April 2011 the agency suspended the rule. All three providers then changed their billing model. Now the standard agreement requires the estate to pay a combined fee for software and banking services based on a percentage of the funds in its bank account.

In May 2011 Integrated Genomics, Inc., a software developer specializing in genome analysis, filed a Chapter 7 petition in the U.S. Bankruptcy Court for the Northern District of Illinois. The U.S. Trustee appointed Eugene Crane as trustee. Crane contracted with BMS for software services and deposited the estate's funds with Rabobank, BMS's partner bank. Crane also contracted directly with Rabobank, authorizing it to automatically withdraw a fee from the estate's account.

McGarry & McGarry, a Chicago law firm and an unsecured creditor of Integrated Genomics, filed a claim in the Chapter 7 proceeding. On August 30, 2013, Crane filed his final report listing a service-fee payment of $514.16 to Rabobank, which deducted that sum from the estate's account. McGarry did not object to the fee. The estate's funds were disbursed, and the case was closed in April 2014. McGarry received $12,472 of its allowed claim of $78,308.

Two years later McGarry learned that most, if not all, of the $514.16 fee went to BMS. In September 2016 McGarry filed a class-action lawsuit against BMS in the Northern District of Illinois alleging violations of the Sherman Act, 15 U.S.C. § 1, and the Illinois Antitrust Act, 740 ILL. COMP. STAT. 10/3 (2018). The district judge granted BMS's motion to dismiss, applying the "indirect purchaser" doctrine announced in *Illinois Brick*. There the Supreme Court explained that indirect purchasers are not proper parties to bring a price-fixing claim under the Sherman Act; the claim belongs to the direct purchaser. *Illinois Brick Co.*, 431 U.S. at 735. McGarry was neither a direct nor an indirect purchaser of bankruptcy software services, so the judge dismissed the federal claim with prejudice. She then relinquished supplemental jurisdiction over the state-law claim, dismissing it without prejudice. McGarry did not appeal.

Instead, McGarry moved to reopen the Chapter 7 proceeding with the aim of raising the issue there. Because the motion was not made within a reasonable time, the bankruptcy judge denied it. McGarry filed a new class-action complaint against BMS, this time in Cook County Circuit Court. This second suit alleged a stand-alone price-fixing claim under the Illinois Antitrust Act. BMS removed the case to federal court, where it was assigned to the judge who handled the first case. A motion to dismiss followed, *see* FED. R. CIV. P. 12(b)(6), and the judge dismissed the case for failure to state a claim. Referring back to her earlier order, the judge reasoned that although the Illinois antitrust statute permits indirect purchasers to sue, that feature of the law does "nothing to help McGarry … for it has admitted that it is not a purchaser at all."

## II. Discussion

We review a dismissal order de novo. *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498, 500 (7th Cir. 2018). The Illinois Antitrust Act prohibits any agreement to fix, maintain, or stabilize the price of any commodity or service. 740 ILL. COMP. STAT. 10/3. The Act expressly requires harmonization with federal antitrust law as interpreted by the federal courts, *see id*. § 10/11, so Illinois courts interpret the state antitrust law in harmony with "[f]ederal case law construing analogous provisions of [f]ederal legislation"— here, Section 1 of the Sherman Act. *People ex rel. Scott v. Coll. Hills Corp.*, 435 N.E.2d 463, 469 (Ill. 1982). McGarry alleges a conspiracy to fix the price of bankruptcy software services, a per se violation of federal and Illinois antitrust law. *See, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *Baker v. Jewel Food Stores, Inc.*, 823 N.E.2d 93, 100 (Ill. App. Ct. 2005).

Both Article III and the Sherman Act impose threshold barriers on a party bringing an antitrust suit in federal court. Article III limits "the judicial power of the United States to the resolution of 'Cases' and 'Controversies.'" *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597 (2007). To satisfy the case-or-controversy requirement, a plaintiff must establish standing to sue. *Id*. at 598. Three elements comprise the "irreducible constitutional minimum" of standing: (1) a concrete and particularized injury in fact that is (2) fairly traceable to the alleged action of the defendant and (3) likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

McGarry has pleaded sufficient facts to support Article III standing, though just barely. The complaint

alleges that the $514.16 fee Rabobank deducted from the Integrated Genomics Chapter 7 account and paid to BMS was greater than it would have been absent the price-fixing conspiracy. The inflated fee reduced the pot of money from which unsecured creditors were paid, and McGarry alleges it received a smaller distribution as a result. If true, the difference is likely quite small given the modest amount of the fee. Still, "financial injuries are prototypical of [Article III] injuries." *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017); *see also Korte v. Sebelius*, 735 F.3d 654, 667 (7th Cir. 2013). And there is a causal connection between the injury and the alleged conspiracy that can be remedied by a favorable judicial decision.

But the "Sherman Act has additional rules for determining 'whether the plaintiff is the proper party to bring a private antitrust action.'" *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). These requirements have been "incautiously lumped together under the umbrella term of 'antitrust standing.'" *Id.* at 480. But this nomenclature, like that of its cousins "prudential standing" and "statutory standing," is a "misnomer." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014); *see also id.* at 128 n.4 (describing "statutory standing" as "an improvement" over "prudential standing" because it "correctly places the focus on the statute" but is nevertheless "misleading").

We've previously noted our concern with the term "antitrust standing" because of its potential for confusion with Article III standing. *See U.S. Gypsum Co. v. Ind. Gas Co.*,

350 F.3d 623, 627 (7th Cir. 2003). The latter, of course, is a necessary requirement for a justiciable case or controversy. The former, on the other hand, concerns a different issue: which plaintiffs may bring the cause of action. *See Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994) ("'[A]ntitrust standing' is not a jurisdictional requirement … .").

Federal antitrust law provides a treble-damages remedy to "any person … injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Though broadly phrased, the Supreme Court has construed this language "to limit the parties who may bring an antitrust action to (1) those who have suffered the type of injury that the antitrust laws were intended to prevent and (2) those whose injuries are a result of the defendant's unlawful conduct." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 595 (7th Cir. 1995) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Because antitrust violations "may be expected to cause ripples of harm to flow through the Nation's economy," the Court has held that "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982). Some injuries are "too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit." *Id.* at 477.

For price-fixing claims in particular, the Supreme Court long ago held that persons downstream in the distribution chain are not proper plaintiffs. The "indirect purchaser" doctrine announced in *Illinois Brick* "forbids a customer of

the purchaser who paid a cartel price to sue the cartelist, even if his seller—the direct purchaser from the cartelist—passed on to him some or even all of the cartel's elevated price." *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 821 (7th Cir. 2015). As we've noted, the district judge invoked the *Illinois Brick* principle in dismissing the Sherman Act claim in McGarry's first suit.

The analogous provision in the Illinois Antitrust Act is phrased in terms similar to its federal counterpart, but there is one notable difference: Illinois has adopted an "*Illinois Brick* repealer" clause that permits indirect purchasers to sue. 740 ILL. COMP. STAT. 10/7(2). But that provision doesn't apply here. As the district judge noted, McGarry isn't even an *indirect* purchaser of bankruptcy software services. The law firm is just a former creditor of a Chapter 7 debtor in a closed bankruptcy case. It doesn't purchase bankruptcy software services at all.

The inapplicability of the *Illinois Brick* repealer provision in the state statute raises the possibility that the judgment in McGarry's first case has preclusive effect in this second suit. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." RESTATEMENT (SECOND) OF JUDGMENTS: ISSUE PRECLUSION–GENERAL RULE § 27 (AM. LAW INST. 1980), *quoted in B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015). The Illinois Antitrust Act's harmonization provision, 740 ILL. COMP. STAT. 10/11, bolsters the case for preclusion. But BMS hasn't

developed a preclusion argument along these lines, so we proceed to the main thrust of McGarry's appeal.

McGarry argues that although it is not a purchaser of bankruptcy software services, it is nonetheless a proper plaintiff to bring this price-fixing claim under the multi-factor test derived from the Supreme Court's decision in *Associated General Contractors*, 459 U.S. at 537–44. As we've synthesized it in earlier cases, the test examines several factors to determine whether the plaintiff has demonstrated the necessary "direct link" between the alleged antitrust violation and the claimed antitrust injury. *Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918, 926–27 (7th Cir. 1995).

The *Associated General Contractors* factors include:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff;
>
> (2) Improper motive;
>
> (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws;
>
> (4) The directness between the injury and the market restraint;
>
> (5) The speculative nature of the damages; [and]
>
> (6) The risk of duplicate recoveries or complex damages apportionment.

*Id.* at 927 (quotation marks omitted). Together, the first three factors relate to what courts commonly refer to as "antitrust injury." *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1563–64 (7th Cir. 1991); *see also Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007). The remaining factors

address whether the plaintiff is among those "who can most efficiently vindicate the purposes of the antitrust laws." *Serfecz*, 67 F.3d at 598 (quotation marks omitted).

The factors are neither strict requirements nor exclusive analytical tools. They simply illustrate the areas of inquiry that may be relevant to a case-specific evaluation of "the plaintiff's harm, the alleged wrongdoing by the defendant[], and the relationship between them." *Associated Gen. Contractors of Cal.*, 459 U.S. at 535.

To put the inquiry more generally, McGarry must demonstrate that its injury is "of the type the antitrust laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489. It's not enough to allege that the injury is merely causally linked to the alleged anticompetitive behavior. *Id.* McGarry must also demonstrate that its injury "is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). In other words, the injury must flow directly "from higher prices or lower output, the principal vices proscribed by the antitrust laws." *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1158 (Ill. App. Ct. 1992) (quotation marks omitted).

McGarry hasn't alleged the type of injury the antitrust laws were meant to prevent. It claims that absent the conspiracy, BMS would not have been able to charge a percentage of the estate's funds as a fee for its bankruptcy software services. But of course McGarry is not a participant in the market for bankruptcy software services. Instead its alleged injury is quite attenuated from the claimed price-fixing violation. McGarry alleges that the conspiracy caused the estate to pay a higher fee for the combined banking and software services, which reduced the funds available in the

Chapter 7 estate to pay claims (however modest the reduction), which caused unsecured creditors like McGarry to receive a smaller distribution. This alleged injury is too remote to serve as the predicate for an antitrust suit.

But even if we concluded that McGarry had adequately pleaded an antitrust injury, the law firm must also demonstrate that it can "efficiently vindicate the purposes of the antitrust laws." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (quotation marks omitted). The fourth *Associated General Contractors* factor—"the directness between the injury and the market restraint"—weighs particularly heavily here. We usually presume that competitors and consumers in the relevant market are the only parties who suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws. *Associated Gen. Contractors of Cal.*, 459 U.S. at 538; *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (collecting cases).

In *Blue Shield of Virginia v. McCready*, the Supreme Court carved out a narrow exception. There the Court held that Carol McCready, a patient treated by a clinical psychologist, suffered an antitrust injury when her insurer, allegedly in concert with a professional organization of psychiatrists, refused to reimburse her psychologist's fees because the health plan covered only psychiatrists. *McCready*, 457 U.S. at 480–81. The Court held that McCready's injury was "inextricably intertwined with the injury the conspirators sought to inflict" on the market. *Id.* at 484. As the Court later described its holding, what mattered was that the plaintiff was a participant in the market targeted by the alleged conspiracy

and was "directly harmed by the [insurer's] unlawful conduct." *Associated Gen. Contractors of Cal.*, 459 U.S. at 529 n.19.

McGarry, however, is not a participant in the market for bankruptcy software services. It is simply a creditor of a Chapter 7 debtor. McGarry's alleged injury is thus entirely derivative of the estate's injury. We held decades ago that "[m]erely derivative injuries sustained by employees, officers, stockholders, *and creditors* of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing." *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987) (emphasis added); *see also Cong. Bldg. Corp. v. Loew's, Inc.*, 246 F.2d 587, 590 (7th Cir. 1957) ("The courts have uniformly denied recovery to … creditors … who claimed injury as the result of alleged antitrust violations.") (citations omitted). The Supreme Court has agreed in dicta. *See Associated Gen. Contractors of Cal.*, 459 U.S. at 533–34 (citing with approval *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d Cir. 1910), which held that a creditor of an injured company does not have antitrust standing).

There is, after all, a more appropriate person to pursue the claim should it be in the estate's interest to do so: the trustee. Because a trustee in bankruptcy owes a fiduciary duty to an estate's creditors, *In re Salzer*, 52 F.3d 708, 712 (7th Cir. 1995), the trustee could "pursue the debtor's claim against [the alleged conspirators] on behalf of all the debtor's creditors equally, without preference for any particular creditor. That injury is much more efficiently measured on behalf of the debtor, moreover, rather than in fortuitous segments claimed by those creditors who happen to sue." IIA PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 353c, at 298–

99 (4th ed. 2014). "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party … to perform the office of a private attorney general." *Associated Gen. Contractors of Cal.*, 459 U.S. at 542.

Because McGarry does not participate in the market for bankruptcy software services in any meaningful way, it is not an appropriate plaintiff to bring this price-fixing claim. The case was properly dismissed.

AFFIRMED