In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-1513

MARION DIAGNOSTIC CENTER, LLC and
MARION HEALTHCARE, LLC,

*Plaintiffs-Appellants,*

*v.*

BECTON DICKINSON & CO., CARDINAL HEALTH, INC., and
MCKESSON MEDICAL-SURGICAL, INC.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:18-cv-01059 — **Nancy J. Rosenstengel**, *Chief Judge.*

———————————

ARGUED NOVEMBER 12, 2021 — DECIDED MARCH 18, 2022

———————————

Before SYKES, *Chief Judge*, and RIPPLE and ST. EVE,
*Circuit Judges.*

ST. EVE, *Circuit Judge.* A putative class of medical providers brought this suit alleging a conspiracy to drive up the prices of conventional syringes, safety syringes, and safety IV catheters ("the Products"). The Providers' First Amended Complaint ("FAC") alleged a hub-and-spokes conspiracy

between manufacturer Becton, Dickinson & Co. ("BD"), group purchasing organizations, and four distributors of the Products in violation of the Sherman Act, 15 U.S.C. § 1. The district court dismissed the FAC for failure to state a claim. When we first considered this case on appeal, we agreed: the Providers' failure to allege that the distributors coordinated with each other in furtherance of the conspiracy doomed their claims on the merits. *Marion Healthcare, LLC v. Becton Dickinson & Co.* (*Marion I*), 952 F.3d 832, 842–43 (7th Cir. 2020). Nonetheless, we vacated and remanded so the Providers could amend their complaint one more time.

In their Second Amended Complaint ("SAC"), the Providers abandoned their horizontal conspiracy allegations and now allege two vertical conspiracies: (1) between BD and McKesson Medical-Surgical, Inc. ("McKesson"), and (2) between BD and Cardinal Health, Inc. ("Cardinal").[1] The district court once again dismissed the SAC for failure to state a claim. The court also concluded that because the named plaintiffs do not purchase the Products directly from Cardinal, they lack "antitrust standing" to sue Cardinal under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). As explained below, we affirm.

## I. Background

### A. Allegations in the SAC

Marion Diagnostic Center, LLC and Marion Healthcare, LLC are small healthcare providers in Marion, Illinois. Like many such providers, they join group purchasing organizations ("GPOs"), which negotiate contracts on behalf of their

---

[1] According to Defendants, Plaintiffs erroneously named Cardinal Health, Inc. as a Defendant. The relevant distribution entity is Cardinal Health 200, LLC.

members for medical products. These GPO-manufacturer contracts are known as "Net Dealer Contracts." GPOs present the terms of the Net Dealer Contracts to providers, who can either accept the terms or attempt to negotiate directly with a manufacturer. If a provider accepts the terms of a Net Dealer Contract, the provider then enters a "Distribution Agreement" with a distributor.[2] Under this scenario, a provider purchases medical products directly from a distributor, who charges the prices agreed to in the Net Dealer Contract plus a markup for the distributor's services.

BD is the leading national manufacturer of the three products at issue: BD controls 60% of the market for conventional syringes, 60% of the market for safety syringes, and 55% of the market for safety IV catheters. According to the Providers, these products are commodities, meaning that they are effectively interchangeable with competitors' products. Nonetheless, BD charges significantly higher prices than its competitors: 11% more for conventional syringes, 36% more for safety syringes, and 37% more for safety IV catheters.

---

[2] The Providers argue that the Distribution Agreements often have one-sided termination clauses, meaning that distributors can terminate those contracts, but providers cannot. Defendants object that the Providers inappropriately supplemented the SAC through their brief opposing the motion to dismiss. *Compare Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012) ("[I]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal."), *with United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (Rule 8 allows a plaintiff to add facts to the complaint "by affidavit or brief—even a brief on appeal."). Because this fact does not alter our analysis, we need not decide whether the Providers raised it too late.

Cardinal and McKesson are two of the largest distributors of the Products. The distribution market entails warehousing, processing orders, marketing, and tech support. Notably, the Providers have not alleged that either Cardinal or McKesson has market power in the distribution market, which includes at least four major players. The Providers also concede that they do not purchase BD products from Cardinal. They allege only that they have purchased the Products from McKesson. Complicating matters further, the Distributors make "Dealer Notification Agreements" with BD, in which the Distributors agree to distribute BD's Products in accordance with the Net Dealer Contracts.

Plaintiffs allege that BD is engaged in two vertical conspiracies to restrain trade in the relevant product markets. Specifically, they allege that BD has a quid pro quo with Cardinal and McKesson. First, the Net Dealer Contracts lock providers into long-term contracts for BD products through sole-source or dual-source provisions, "penalty pricing" rebate provisions, and bundling. Second, Cardinal and McKesson enforce those contracts, monitor providers' compliance, and supply BD with purchasing information, going above and beyond the terms of the Distributors' contractual obligations to BD. Third, Cardinal and McKesson coerce providers into buying only BD products through alleged misrepresentations about the quality or availability of competitors' products, even when doing so is inconsistent with their own self-interest. Cardinal, for example, allegedly promotes BD's products over its competing in-house brand, Covidien. Fourth, BD rewards these Distributors with various incentives.

The Providers allege that BD has engaged in other anti-competitive acts in furtherance of the conspiracies. Namely,

BD has made false claims about its own products while disparaging the products of its rival, Retractable, and BD has been found liable for infringing Retractable's patents. Additionally, BD has entered exclusionary contracts with large healthcare providers (outside the GPO system) that bundle the three products at issue with other BD products. These allegations appeared in the FAC, which this court previously held failed to state a claim. *Marion I*, 952 F.3d at 842–43.

According to the Providers, all of this conduct amounts to antitrust injury by allowing BD to inflate the prices of the Products above competitive levels. The SAC further alleges that the conspiracies harm innovation in the relevant product markets by deterring potential entrants, thereby reducing product quality and safety.

### B. Dismissal of the FAC

In the FAC, the Providers alleged a hub-and-spokes conspiracy between BD, Cardinal, McKesson, two other distributors, and two GPOs in violation of the Sherman Act, 15 U.S.C. § 1.[3] The district court dismissed the FAC based on a misapplication of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In *Illinois Brick*, the Supreme Court held that a direct purchaser from an alleged monopolist or cartel member is the proper party to bring suit; by contrast, indirect purchasers further down the supply chain may not bring suit, even if they pay

---

[3] Technically, the Providers' cause of action is rooted in the Clayton Act, not the Sherman Act. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a).

higher prices as a result of an upstream defendant's anticompetitive conduct. *Id*. at 728–29.[4]

This court has recognized a conspiracy "exception" to *Illinois Brick*, in which plaintiffs who purchase from one member of an antitrust conspiracy may bring suit against any member of the conspiracy. *See Paper Sys., Inc. v. Nippon Paper Indus., Co.*, 281 F.3d 629, 631–32 (7th Cir. 2002).[5] In *Paper Systems*, paper distributors sued five manufacturers of thermal facsimile paper, alleging that the manufacturers had engaged in a horizontal price-fixing conspiracy among themselves, as well as vertical conspiracies with two trading firms (middlemen). The plaintiffs purchased directly from two of the manufacturers and indirectly from two other manufacturers via the trading firm defendants, so there was no question that the plaintiffs could sue those defendants. A fifth manufacturer, Nippon Paper, sold its product to distributors who were not alleged to be part of the conspiracy. The court explained that, even though the plaintiffs did not purchase directly from Nippon, they could sue Nippon under *Illinois Brick* because Nippon was allegedly part of the same conspiracy as the four other manufacturers and two trading firms. *Paper Systems*'

---

[4] The facts of *Illinois Brick* offer a useful illustration. There, the State of Illinois sued Illinois Brick, a manufacturer of concrete blocks, alleging that Illinois paid more for the concrete blocks than it would have absent a price-fixing conspiracy. Illinois Brick sold the blocks to masonry contractors, who sold them to general contractors, who sold their services to the State of Illinois. Because the State had not purchased the blocks directly from Illinois Brick, the State was not the proper party to bring suit.

[5] Other circuits have reached the same conclusion. *See Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015); *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1229–31 (11th Cir. 1999); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211–13 (9th Cir. 1984).

interpretation of *Illinois Brick* reinforces the principle that antitrust liability is joint and several, meaning that each member of a conspiracy may be held liable for all of the damages caused by the conspiracy. *Id*.

Returning to the FAC in this case, the district court incorrectly believed that the conspirator "exception" to the direct-purchaser rule was limited to price-fixing conspiracies. *See Marion Diagnostic Ctr., LLC v. Becton, Dickinson, & Co.*, No. 18-CV-01059-NJR-RJD, 2018 WL 6266751, at *4 (S.D. Ill. Nov. 30, 2018). The FAC alleged that a web of contracts allowed BD to charge supracompetitive prices, not that BD conspired with the distributors and GPOs to fix prices for the Products. Because Plaintiffs were not alleging a traditional price-fixing conspiracy, and because "[a]pportioning overcharges in this case would lead to the complexities *Illinois Brick* sought to avoid," the district court concluded that they were not direct purchasers and therefore could not bring suit against BD. *Id*.

## C. *Marion I*

On appeal, this court clarified that the conspiracy "exception" to *Illinois Brick* is not limited to price-fixing conspiracies. *See Marion I*, 952 F.3d at 839. We explained that "it is better to think of the right to sue co-conspirators not as an exception to *Illinois Brick*, but instead as a rule inhering in *Illinois Brick* that allocates the right to collect 100% of the damages to the first non-conspirator in the supply chain." *Id*. (citing *Paper Sys.*, 281 F.3d at 631–32). We also observed: "*Apple* [*v. Pepper*] confirms that *Illinois Brick* is a bright-line rule allocating the right to sue to direct purchasers alone …. The relationship between the buyer and the seller, rather than the nature of the alleged anticompetitive conduct, governs whether the buyer may sue under the antitrust laws." *Id*. at 840 (citing 139 S. Ct. 1514, 1522

(2019)). The court concluded that the Providers could sue the distributors under *Illinois Brick* because the distributors were allegedly conspirators with BD. *Marion I*, 952 F.3d at 840–41.

Turning to the sufficiency of the complaint, however, the *Marion I* court held that the Providers had failed to allege a plausible hub-and-spokes conspiracy. *Id*. at 843. We noted: "The role of the distributors is critical to the Providers' case. … If the distributors were not part of the alleged conspiracy, then [the] Providers' case falls apart: no conspiracy, no direct purchaser status, no right to recover." *Id*. at 841. To plausibly allege an antitrust conspiracy, the Providers needed to show that "the manufacturer and others had a *conscious commitment to a common scheme* designed to achieve an unlawful objective." *Id*. (emphasis added) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).

The FAC failed to state a claim because the Providers did not allege that the distributors (the "rim") coordinated with each other at the direction of BD (the "hub"). *Marion I*, 952 F.3d at 842–43. Instead, the FAC alleged only that the distributors enforced the Net Dealer Contracts between BD and the GPOs and charged a fee for the distributors' services. The Providers did not even allege that the distributors knowingly engaged in parallel conduct, which could have constituted circumstantial evidence of an agreement.[6] *Id*. "All the Providers have alleged is that the distributors buy and sell the devices in accordance with the terms of the contracts that the GPOs

---

[6] Independent action does not violate Section 1 of the Sherman Act. *See Monsanto*, 465 U.S. at 760; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007) (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

have negotiated." *Id*. at 843. "They have made no argument that the distributors played any role in setting the anticompetitive pricing or that there was any quid pro quo according to which Becton compensated them for participating in the alleged antitrust conspiracy." *Id*. We vacated and remanded so that the Providers could file an amended complaint, "provided that they believe they can adequately plead that the distributors were part of the putative conspiracy." *Id*.

**D. Dismissal of the SAC**

On remand, the Providers narrowed their allegations in the SAC to two vertical conspiracies between (1) BD and Cardinal, and (2) BD and McKesson. In other words, the Providers dropped their allegations against the GPOs and two other distributors, and the Providers no longer allege a horizontal conspiracy among the remaining distributors. BD, Cardinal, and McKesson all moved to dismiss the SAC for failure to state a claim. The Distributors further argued that the Providers lacked Article III standing to sue Cardinal because the Providers purchased the Products only from McKesson.

The district court agreed with the Defendants and dismissed the case. *Marion Diagnostic Ctr., LLC v. Becton, Dickinson & Co.*, No. 3:18-CV-1059-NJR, 2021 WL 961728 (S.D. Ill. Mar. 15, 2021). Relying on *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457 (7th Cir. 1981), the district court concluded that both Article III and *Illinois Brick*'s direct-purchaser rule require the Providers to show a "sufficient nexus between the defendant's alleged actions and an injury to plaintiffs." *Id*. at 469. The Providers failed to meet this standard, in the district court's view, because any alleged injury from Cardinal's anticompetitive activity was "vague and tenuous." *Marion Diagnostic Ctr.*, 2021 WL 961728, at *2.

Even if the Providers had standing to sue Cardinal, the district court concluded they had failed to allege that BD and the Distributors had "a conscious commitment to a common scheme." *Monsanto*, 465 U.S. at 768. The court summarized six key allegations and sorted them into two categories: factors showing quid pro quo, and factors showing conscious commitment. The court concluded that the following allegations were insufficient to show quid pro quo: the Distributors' sales staff receive bonuses and other incentives, the Distributors receive higher distribution fees, and the Distributors benefit from guaranteed purchasing volume from long-term contracts. These allegations are essentially recycled from the FAC, which this court already held was insufficient to state a claim in *Marion I*.

The district court then concluded that the following allegations were insufficient to show conscious commitment: BD's dominant market share facilitates collusion and there are high barriers to entry; the Distributors' actions are "contrary to their self-interest" because they should naturally prefer upstream competition; the Distributors' contracts with BD include agreements to exclude BD's rivals; the Distributors have the motive to conspire because of BD's dominance in the market; and the Distributors frequently communicate with BD "beyond what is necessary to merely buy and sell products."

Because the district court concluded that the SAC failed to state a claim, the court did not address Defendants' related argument that the Providers failed to allege Cardinal or McKesson had market power in the distribution market. The Providers timely appealed.

## II. Discussion

This court reviews the district court's dismissal for failure to state a claim de novo. *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1062 (7th Cir. 2019). More specifically, we take a fresh look at the district court's conclusions that the Providers (1) lack standing to sue Cardinal and (2) failed to state a Section 1 conspiracy claim. *Id.* at 1062–63.

### A. Standing

All agree that the Providers have standing to sue McKesson and BD. The Providers contend that they also have standing to sue Cardinal, even though they did not purchase the Products from Cardinal.

Article III limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. The "irreducible constitutional minimum" of standing requires that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). This court has recognized that "financial injuries are prototypical of [Article III] injuries," meaning that paying inflated prices due to an anticompetitive scheme will satisfy injury-in-fact. *McGarry & McGarry*, 937 F.3d at 1063 (alteration in original); *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480–81 (7th Cir. 2002) ("There is no dispute that the plaintiffs in these cases have been injured by paying an inflated price for copper; their Article III standing is therefore secure.").

The Providers argue that the district court "hopelessly confused Article III standing and antitrust 'standing'

doctrine" when it concluded that the Providers lack standing to sue Cardinal. The district court's opinion did not cite Article III, but it did observe that the "general standing" and "antitrust injury" inquiries "may overlap considerably." *Marion Diagnostic Ctr.*, 2021 WL 961728, at *2 (citing *Weit*, 641 F.2d at 469).

In *Weit*, a putative class of credit card holders alleged that five banks were engaged in a horizontal conspiracy to fix credit card interest rates, as well as vertical conspiracies with smaller "correspondent banks." *Weit*, 641 F.2d at 459. This court affirmed the district court's grant of summary judgment in favor of defendants on both the horizontal conspiracy claims and the vertical conspiracy claims. *Id*. at 466, 468–69. We then addressed whether plaintiffs had standing to assert a vertical conspiracy claim against one bank (Pullman), even though none of the named plaintiffs had Pullman credit cards, because the district court had dismissed Pullman solely for lack of standing. *Id*. at 469. We cited *Illinois Brick* in passing for the proposition that plaintiffs must show a direct "antitrust injury," rather than for the direct-purchaser rule.[7] *Id*.

---

[7] Antitrust injury and antitrust standing are related but distinct concepts. The canonical case on antitrust injury is *Brunswick v. Pueblo Bowl–O–Mat*, not *Illinois Brick*. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 487–89 (1977) (holding that mere economic loss does not amount to an antitrust injury under the antitrust laws). In *Brunswick*, bowling alley operators alleged that a competitor hurt their businesses by acquiring struggling bowling alleys that otherwise would have gone bankrupt. The Supreme Court rejected their theory of antitrust liability, reiterating that the antitrust laws protect "competition not competitors." *Id*. at 488. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

Without discussing Article III, the court concluded that plaintiffs were unable to establish a "nexus" between the alleged Pullman conspiracy and any injury to plaintiffs. *Id*.

The district court's reliance on *Weit* was admittedly imprecise. The Providers correctly note that Cardinal asked the district court to dismiss on the basis of Article III standing, not antitrust standing. The Distributors respond that the district court properly concluded the Providers' alleged injury (inflated prices for BD products purchased from McKesson) was not fairly traceable to Cardinal's alleged conduct (a vertical conspiracy with BD). As explained below, we agree with the Distributors that the Providers lack standing to sue Cardinal under both Article III and *Illinois Brick*. At the same time, we take this opportunity to clarify the distinction between the two doctrines, even when they point in the same direction.

### 1. Article III

The Providers rely on cases like *Loeb Industries, Inc. v. Sumitomo Corp.* and *Sanner v. Board of Trade of City of Chicago* to argue that they have satisfied Article III standing.[8] The plaintiffs in *Loeb* purchased copper on the cash market and alleged that copper merchants and brokers conspired to manipulate the price of copper on the futures market. The court held that plaintiffs had Article III standing to sue, even though the buyers were not participants in the copper futures market,

---

[8] The Providers also cite *McGarry & McGarry, LLC v. Bankruptcy Management Solutions, Inc.*, 937 F.3d 1056 (7th Cir. 2019), but that case is distinguishable. 937 F.3d 1056, 1063, 1065–66 (7th Cir. 2019) (concluding that plaintiff had "just barely" pleaded sufficient facts for Article III injury-in-fact, and in any event, plaintiff did not allege the type of injury the antitrust laws were meant to prevent).

because the defendants' alleged conduct influenced the price of copper on the cash market. *Loeb*, 306 F.3d at 480–81.

Similarly, in *Sanner*, a group of soybean farmers alleged that a conspiracy between the Chicago Board of Trade and several individuals had artificially suppressed the price of soybean futures, causing the farmers to sell their soybeans at correspondingly low prices on the cash market. 62 F.3d 918, 921 (7th Cir. 1995). This court held that the farmers had Article III standing because their injury was fairly traceable to the alleged conspiracy. *Id*. at 924–25, 927–30. As in *Loeb*, it was irrelevant that the farmers were not participants in the soybean futures market because the conspiracy caused them harm when it came time to sell their soybeans. *Id*. at 929 ("Since one market tends to move in lockstep with the other, participants in the cash market can be injured by anticompetitive acts committed in the futures market.").

We agree that the Providers have sufficiently alleged an injury-in-fact in the form of higher prices for BD's products, but they have not shown that their injury is fairly traceable to Cardinal's conduct. According to the Providers, *Loeb* and *Sanner* recognize that "a plaintiff has standing simply if it buys products at market prices affected by the defendants' conduct, even if that conduct occurred in a *separate* market." This broad interpretation would eviscerate *Illinois Brick*'s direct-purchaser rule because plaintiffs could always argue that an upstream conspirator's conduct resulted in higher prices downstream.

Moreover, this case is distinguishable from *Loeb* and *Sanner* because the Providers have not alleged that the price of the three BD Products is readily determinable outside the context of contract negotiations between the GPOs and BD.

Syringes and catheters are not like soybeans and copper be-
cause the prices of medical products are not listed on a com-
modity exchange. The SAC itself alleges that prices vary de-
pending on terms in the Net Dealer Contracts regarding bun-
dling, long-term discounts, penalty-pricing rebate provisions,
and so forth.

We also note that the Providers cannot "piggy-back on the
injuries of the unnamed class members" who may have pur-
chased BD products from Cardinal. *Payton v. County of Kane*,
308 F.3d 673, 682 (7th Cir. 2002) ("Standing cannot be acquired
through the back door of a class action."); *see also TransUnion
LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("Every class mem-
ber must have Article III standing in order to recover individ-
ual damages.").[9]

### 2. Direct-Purchaser Status

In addition to satisfying Article III standing, the Providers
must show that they have suffered an antitrust injury and that
they are the proper parties to bring suit. We assume for pur-
poses of this analysis that the Providers have suffered an an-
titrust injury because they are allegedly paying higher prices
for BD's products than comparable products sold by compet-
itors.[10] The relevant question here is whether the Providers
are the proper party to bring suit for that injury.

---

[9] Furthermore, if the litigation were to proceed to the class certification
stage, the Providers would not be adequate representatives of medical
providers that purchase the Products from Cardinal. *See* Fed. R. Civ. P.
23(a)(4).

[10] *Cf. Chi. Studio Rental, Inc. v. Ill. Dep't of Commerce*, 940 F.3d 971, 978–79
(7th Cir. 2019) (concluding that plaintiff film studio "has pleaded an injury
to itself, not an anticompetitive injury to the market").

To recap, in *Illinois Brick*, the Supreme Court held that a direct purchaser from an alleged monopolist or cartel member is the proper party to bring suit; by contrast, indirect purchasers further down the supply chain may not bring suit, even if they pay higher prices as a result of the defendant's anticompetitive conduct. 431 U.S. at 729. This court has interpreted *Illinois Brick* such that a direct purchaser may sue any member of an alleged antitrust conspiracy, so long as the plaintiff is a direct purchaser from at least one member of the conspiracy. *See Paper Sys.*, 281 F.3d at 631–32; *Marion I*, 952 F.3d at 839.

The Providers are direct purchasers from McKesson, which is allegedly in a vertical conspiracy with BD. The problem here is that the Providers amended their complaint such that they are no longer alleging a horizontal conspiracy between the Distributors. Instead, they now allege two *independent* vertical conspiracies between BD and McKesson, on the one hand, and BD and Cardinal, on the other. Given these allegations, the Providers cannot sue Cardinal under *Illinois Brick* because the SAC makes clear that they do not purchase BD Products from Cardinal.

The Providers claim that they "pay supracompetitive prices for Becton Products whether they buy from Cardinal, McKesson, *another distributor*, or Becton itself." But the SAC does not allege that all distributors are in the same conspiracy; rather, the allegations are limited to Cardinal and McKesson, just two of at least four major distributors. This discrepancy is significant because the Providers do not allege that either Cardinal or McKesson has market power in the distribution market. Without market power, it is hard to understand how Cardinal or McKesson would be able to raise prices on BD's

products without losing business to other distributors. As this court made clear when ruling on the sufficiency of the FAC, "the first buyer from a conspirator is the right party to sue." *Marion I*, 952 F.3d at 836 (quoting *Paper Sys.*, 281 F.3d at 631). Because the Providers are no longer alleging a horizontal conspiracy among the Distributors, the so-called conspirator exception outlined in *Paper Systems* is inapplicable.

Our conclusion aligns with the general principal that antitrust conspiracy liability is joint and several. *See Paper Sys.*, 281 F.3d at 631–32. If Cardinal is not part of the BD-McKesson conspiracy, and Plaintiffs are not purchasing the Products from Cardinal, then it does not make sense to hold Cardinal liable, either for the BD-McKesson conspiracy or for the BD-Cardinal conspiracy.

* * *

To summarize, the Article III and *Illinois Brick* inquiries lead to the same outcome in this case: the Providers are not the proper parties to bring suit against Cardinal. But the inquiries remain distinct and serve different purposes. The Providers cannot sue Cardinal under Article III because their injury is not fairly traceable to Cardinal's conduct. They also cannot sue Cardinal under *Illinois Brick*, as interpreted by this court in *Paper Systems*, because they do not purchase the Products from either member of the BD-Cardinal conspiracy.

### B.  Failure to State a Claim

Because the Providers lack standing to sue Cardinal, our analysis of the merits focuses on the remaining alleged vertical conspiracy between BD and McKesson. The district court properly dismissed the SAC for failure to state a claim. We begin with an overview of the legal standards governing

vertical restraints of trade and then explain why the SAC falls short.

### 1. Vertical Restraints

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Courts have long recognized that Section 1 prohibits only *unreasonable* restraints of trade. *See generally Standard Oil Co. v. United States*, 221 U.S. 1 (1911). Horizontal price-fixing agreements between competitors are classic per se violations of Section 1, meaning that they are presumed unlawful. *See, e.g., Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). By contrast, vertical restraints are analyzed under the fact-specific rule of reason. *See Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58–59 (1977) (holding that vertical nonprice restraints are subject to the rule of reason); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007) (holding that vertical price restraints, including minimum resale prices, are subject to the rule of reason).

Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *GTE Sylvania*, 433 U.S. at 49. Relevant factors include the restraint's history, nature, and effect; specific information about the relevant business; and whether the businesses involved have market power.[11] The purpose of the

---

[11] *See, e.g., Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (equating the rule of reason with "an inquiry into market power and market structure designed to assess [a restraint's] actual effect"); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45–46 (2006) (holding that plaintiffs alleging antitrust violation from tying arrangements involving a

rule is to distinguish "between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin*, 551 U.S. at 886.

Before this court can even apply the rule of reason analysis, it needs to resolve the threshold question whether the SAC sufficiently alleges a vertical conspiracy between BD and McKesson. In *Monsanto Co. v. Spray-Rite Service Corp.*, the Supreme Court announced the following standard of proof for vertical conspiracies: "there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had *a conscious commitment to a common scheme* designed to achieve an unlawful objective." 465 U.S. 752, 768 (1984) (emphasis added). Two features of *Monsanto* complicate its applicability to this case. First, the *Monsanto* court was reviewing a jury verdict, so the Court did not opine on the kinds of allegations necessary to state a claim. Second, at the time that *Monsanto* was decided, vertical price-fixing (also referred to as resale price maintenance) was still per se illegal. Today, the same conduct would be evaluated under the rule of reason. *See Leegin*, 551 U.S. at 882 (overruling *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911)).

That being said, some language in *Monsanto* remains useful for analyzing the sufficiency of the SAC. In particular, the Court noted: "[T]he fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions. A manufacturer and

patented product must prove that a defendant has market power in the tying product).

its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market." *Monsanto*, 465 U.S. at 762. "Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently." *Id.* at 763–64. These passages suggest that the Providers' allegations regarding the Distributors' frequent communications with BD are not necessarily indicative of collusion.

### 2. *The SAC*

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 8(a)(2). We accept the factual allegations in the SAC as true and draw all permissible inferences in favor of the Providers. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020). To state a Section 1 claim, a plaintiff must allege that the defendant "(1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 833 (7th Cir. 2021).

The Providers contend that the district court was wrong to separate their allegations into two groups: allegations tending to show a "conscious commitment," and allegations tending to show quid pro quo. They argue that the district court should have considered the SAC as a whole, and that doing so would have led it to a different conclusion. The Providers' fixation on the two categories of allegations is a red herring.

The real question is whether the Providers' new allegations fare any better than those in the FAC.

Many of the Providers' allegations are "recycled," and we already deemed those allegations insufficient in *Marion I*. The Providers' allegations regarding BD's "other anticompetitive acts," for example, are essentially unchanged from the FAC. Similarly, allegations regarding BD's "rewards to the distributors," now offered as evidence of a quid pro quo, appeared elsewhere in the FAC. The Providers previously alleged that: (1) the fees distributors receive are tied to prices paid for BD products (as negotiated with GPOs in the Net Dealer Contracts), (2) BD pays higher commissions to distributors than its rival manufacturers, and (3) long-term contracts provide distributors with guaranteed purchasing volume. Those allegations also appear in SAC.

The Providers point to additional details in the SAC, including allegations that the Distributors receive not only commissions, but also bonuses, gifts, vacations, and other perks, thereby reducing the Distributors' labor costs. We are skeptical that these incentives constitute sufficient circumstantial evidence of a conspiracy, particularly because the incentives are directed to frontline sales representatives. To participate in a conspiracy, agents of a defendant must have "knowledge of the principal's unlawful objective" and "an intent to restrain trade." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1474c (last updated Sept. 2021); *see also id*. ("The broker who merely earns its commission … does not share a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" (quoting *Monsanto*, 465 U.S. at 764)). The SAC is silent on whether the Distributors' sales

representatives knew of any conspiracy, much less shared an intent to participate in one.

The Providers added the following "new" allegations in the SAC: that the Distributors go beyond their contractual obligations by cutting off lines of credit, increasing delivery fees, embedding sales staff with providers to monitor compliance with exclusive-dealing terms, and providing purchasing history to BD but not to other manufacturers. It is "conceivable" that McKesson took steps along these lines to encourage providers to buy BD products. *Twombly*, 550 U.S. at 570. But as the Defendants argue, those steps are just as consistent with the Distributors' rational, lawful self-interest in encouraging sales with a leading manufacturer. *See id*. at 554.

The primary obstacle for the Providers is that they have narrowed their allegations from a hub-and-spokes conspiracy to two vertical conspiracies. The Providers have also dropped their allegations against two other distributors and the GPOs. In other words, they now need to show that vertical conspiracies involving just two distributors and BD could plausibly influence the prices that the Providers pay for the Products, regardless of which distributor they purchase from, and regardless of the fact that there are at least four major distributors. In our view, this is simply not plausible. The Providers have not included any allegations showing that McKesson is unique in its attempts to encourage sales of BD products, or that the benefits McKesson receives from selling BD products differ from the benefits any other distributor would receive.[12]

---

[12] The only Cardinal-specific allegation is that Cardinal promotes BD's products over those of its in-house brand, Covidien. This allegation alone

If other distributors receive the same benefits but are not alleged to be conspiring with BD, then there is no basis to infer the existence of a conspiracy between McKesson and BD.

The Distributors are also not involved in negotiating prices for BD products in the Net Dealer Contracts—those negotiations are solely between BD and the GPOs. The Distributors benefit from a percentage markup of those prices if and only if providers decide to purchase BD's products from a particular distributor. In that way, all distributors benefit indirectly from marketing BD products to providers because they will make more money than if they sell another manufacturer's products. That does not mean, however, that McKesson is conspiring with BD to raise prices. *See Marion I*, 952 F.3d at 839 ("[T]he manufacturer has an incentive to get the best deal it can from its distributors, both in terms of price and in terms of necessary services. … The manufacturer's interests thus align with those of the consumer who buys from the distributor, not with those of the distributor."). Moreover, the Providers have not convincingly explained why they cannot choose distributors who are not alleged to be conspiring with BD.

The Providers cite *Twombly*'s plausibility standard repeatedly, but the outcome in that case cuts against them. *Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest. *See Twombly*, 550 U.S. at 554 (noting that parallel conduct is "consistent with conspiracy, but just as

---

is insufficient to move the needle, and more importantly, the Providers lack standing to sue Cardinal.

much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"). Because the Providers have not plausibly alleged a vertical conspiracy between BD and McKesson, we affirm the district court's decision on that basis.

The district court declined to reach the Distributors' alternative basis for dismissal—that the Providers failed to allege Cardinal or McKesson has market power in the distribution market. In light of our conclusion that the SAC fails to state a claim, we decline to address this argument in the first instance.

### III. Conclusion

For the foregoing reasons, the district court's grant of the motion to dismiss is

AFFIRMED.